(157 App. Div. 171.)

PEOPLE v. BROOKLYN BANK IN CITY OF NEW YORK et al.    SAME
v. BROOKLYN BANK IN CITY OF NEW YORK.
HIGGINS v. HASBROUCK et al.

(Supreme Court, Appellate Division, Third Department.   May 22, 1913.)

APPEAL AND ERROR (§ 1221*)—ALLOWANCES—MODIFICATION—GROUNDS.

   A receiver of a bank appealed from an order allowing receivers $19,000
each on the ground that the allowances were excessive.   The court on
appeal reduced the allowances to $12,000 each, and directed a return by
the receivers of the balance.   Pending the appeal, the receiver voluntarily
returned $4,000 to the bank and procured a release from all claims against
him.   He had expended out of his own money over $3,000 in procuring a
judgment setting aside a contract made by the coreceiver.   *Held*, that the
receiver was entitled to credit for the expenses incurred, and the judg-
ment directing the return of the excessive allowance must be modified, so
as to relieve him from further obligation to refund.

   [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4722;
Dec. Dig. § 1221.*]

   Kellogg, J., dissenting.

On reargument of application previously made by Charles M. Hig-
gins, receiver of the Brooklyn Bank, for a modification of a decree
previously entered.   Decree modified.

For former decision, without opinion, see 153 App. Div. 933, 138
N. Y. Supp. 1134.

Argued before SMITH, P. J., and KELLOGG, LYON, HOW-
ARD, and WOODWARD, JJ.

Charles M. Stafford, of Brooklyn, for appellant.

Philbin, Beekman, Menken & Griscom, of New York City (S. Stan-
wood Menken and Stephen P. Anderton, both of New York City, of
counsel), for respondent Brooklyn Bank.

WOODWARD, J.   Charles M. Higgins and Bruyn Hasbrouck were
duly appointed as receivers of the Brooklyn Bank in the City of New
York.   The Brooklyn Bank was released from said receivership, and
by the order of release allowances of $19,000 were made to each of
the above-named receivers.   Mr. Higgins thought these allowances ex-
cessive, and an appeal was taken to this court, where the same were
reduced to $12,000 each, and the receivers were directed to return any
part of the allowances in excess of this sum for the benefit of the
Brooklyn Bank.   Before this court had made its order reducing the
allowances, the same had been paid; but Mr. Higgins had voluntarily
relinquished the sum of $4,000 to the Brooklyn Bank, and had taken
a release from that institution from all claims against him growing out
of the receipt of the $19,000 allowed by the Special Term.   This re-
lease is under seal, is very inclusive in its scope, and was evidently in-
tended by the Brooklyn Bank to close the affairs of the receivership
in so far as Mr. Higgins was concerned.   It appears from matters
now before this court that Mr. Higgins had expended out of his own
moneys something over $3,000 in a successful effort to set aside a con-
tract which had been made by his coreceiver, and which was deemed

prejudicial to the best interests of the receivership, and that, in making the settlement with the Brooklyn Bank, and paying over the $4,000, it was agreed between Mr. Higgins and the officers of the bank that Mr. Higgins should be allowed $3,000 on account of these expenditures, and that the release in question was designed to complete the transaction, and was regarded, with the $4,000 which was voluntarily returned, as the equivalent of the $7,000 excessive allowances made by the Special Term.

Mr. Hasbrouck appealed from the order of the Appellate Division reducing the allowances of the receivers, but this appeal was dismissed on the motion of Mr. Higgins, and thereafter the judgment of the Court of Appeals was made the judgment of the Supreme Court, and a new judgment was entered, by the terms of which Mr. Higgins was directed to return $3,000, in addition to the $4,000 which he had already surrendered; the judgment requiring Mr. Hasbrouck to return $7,000. Mr. Higgins subsequently moved at Special Term to modify the judgment determining the allowances, so as to give effect to the release from the Brooklyn Bank. This motion was denied, and an appeal was brought to this court, where it was held that under the circumstances the Special Term was justified in refusing the relief. Since that time, however, the true facts in the case have been brought to the attention of this court, and it does not seem to us fair or equitable that Mr. Higgins, who has done so much to preserve the assets of the Brooklyn Bank, and who has acted in good faith throughout the entire receivership, should be punished for his inadvertence in reference to his own affairs. He has, at no time, lost sight of the interests of the Brooklyn Bank; he has protected it against excessive allowances both to himself and his coreceiver, as well as to the counsel involved in the receivership; and, having relied upon his release and in this manner neglected to protect himself against the judgment, the Brooklyn Bank ought not to be permitted to take advantage of Mr. Higgins and compel him to stand the expenses growing out of his efforts to protect the bank. It does not seem necessary to require Mr. Higgins to go into a court of equity to prevent the working of this wrong. There is no question about the facts, and the simple modification of the judgment now under consideration will do substantial justice, and it ought to be resorted to at this time.

The decree appealed from should be so modified as to relieve Mr. Higgins of the repayment of the $3,000 which he has expended, and for which the Brooklyn Bank has conceded its liability, without costs of this motion.

SMITH, P. J. (concurring). After the defendant insisted upon the return by petition of the $3,000 specified in the judgment of the Appellate Division, a motion was made to this court for a reargument and modification of our decision wherein the $3,000 judgment was directed. Some of the members of the court were of opinion that the relief should be sought at Special Term; others were against the granting of the motion upon the merits. The majority of the court, therefore, were of opinion that the motion should be denied. There-

after the motion was made at Special Term, and upon the hearing at Special Term the defendant insisted and procured a holding by the Special Term adjudging that the matter had been determined by the Appellate Division in its denial of the petitioner's motion, and that the Special Term could do nothing but affirm that action. Upon the appeal from that order to the Appellate Division, the majority of the court were of opinion that the Special Term rightly followed the determination of the Appellate Division and was bound thereby, and therefore that order was affirmed, with leave to renew the motion for reargument and modification in this court. As the defendant has procured from the Special Term a holding to the effect that the Special Term was bound by the former decision of this court, it is not now in position to claim that the petitioner's relief should have been had at Special Term rather than in this court.

This brings us to the merits of the application. In our original judgment in the case we determined that the allowance to the receivers of $19,000 for their work was excessive, and that the allowance should have been $12,000 for their services in performing the duties of the office. The receiver Higgins, at a personal expense of about $3,000, had secured the annullment of the Dolson contract, which was an illegal contract and prejudicial to the interests of the trust. If those matters had been before the Appellate Division, he fairly should have been allowed for his expenses in securing that valuable right to the trust estate. This fact would seem to be alone sufficient to authorize this court to modify this decree and grant to the receiver Higgins, not only the $12,000 allowance, but an allowance of $3,000 to cover the expenses of the annullment of the Dolson contract. Of the $19,000 received by him he had already surrendered $4,000, so that he had in fact received $15,000, the amount which equitably should be allowed for his services and for this expense item of $3,000. But, in addition to this, it appears that of the moneys received Mr. Higgins has passed $5,000 over to pay the expenses of the depositors' committee, which was a moral obligation of the bank, and the balance of the expenses were afterwards paid by the bank itself. He had expended, besides the $3,000 for services in procuring the annulment of the Dolson contract, $3,000 additional for other services of counsel in other matters relating to the estate. He had been advised that the legal fees of the receiver would amount to $15,000, instead of $19,000, and upon the assumption that the fees would be reduced simply to the legal maximum, after giving the $5,000 to the depositors' committee and retaining $6,000 to reimburse himself for expenses paid, he set apart $4,000 as a reserve fund to meet subsequent expenses, and from the balance left he promised to give part to the bank and part to some charitable purpose. There was at no time any binding promise upn his part to act without compensation. His position at first was that he would act for such compensation as should be approved by the depositors' committee and by the court. After the excessive allowances made by the Special Term, he did state to the depositors' committee that he would act without compensation for his personal services. But that promise was not binding upon him. There was no

consideration therefor, and if he should choose to change his mind and demand a compensation, which the law allows and to which he is equitably entitled, the court would grant it. But this promise has been in fact fulfilled. He has paid $5,000 to the depositors' committee. He has paid $6,000 in expenses both in the Dolson contract and other matters. The $4,000 which he placed in the reserve fund has been exhausted by subsequent expenses in the matter of the trust. It is true that this does not appear under Mr. Higgins' oath, but it appears in the communication to Mr. Brayton Ives of December 1, 1911. It is nowhere contradicted. This makes $15,000 expended by him for the benefit of this trust, for which he has been allowed only $12,000 by this judgment. So that, if this judgment be modified as requested by him, he would simply be allowed his expenses, without retaining one cent for his services.

This result is reached, irrespective of this release executed by the bank to him, which is claimed to constitute a release of this indebtedness. I concur with Mr. Justice WOODWARD that the release is broad enough to cover this claim; but it seems to me of small moment what may be the technical construction of this release. He swears that the matter was all agreed to between him and the officers of the bank, that he should receive $15,000 allowance and should expend it in the way indicated, and that that was what was meant to be provided for in the release. I have looked in vain through the papers for any denial of this understanding between him and the officers of the bank, and with this distinct agreement made every equity is in favor of the modification of the decree to provide for these expenses. Criticism is made that this was kept secret from his coreceiver and from the court, although this release existed and this agreement was made before the argument before this court. There certainly could be no obligation to disclose the matter to this coreceiver, to whom he was acting in open hostility, and especially as he was seeking no advantage over the receiver, but was consenting to take practically nothing for his services. There was not the slightest reason at that time for his disclosing the matter to the court. The only object which he could have had in disclosing the matter was to have had the court allow him $3,000 for expenses over and above the amount for services, and for this he had the clear right to rely upon the explicit agreement which he had made with the officers of the bank, and upon their failure to carry out that agreement he is justified in coming to the court and asking relief.

I concur, therefore, in recommending the modification of the decree as asked for.

JOHN M. KELLOGG, J. (dissenting). A careful consideration of the facts makes it clear that, when the petitioner pays the $3,000 required by the order appealed from, he and the bank will occupy respectively the position which their mutual understanding contemplated. In his petition he states that, after taking the $19,000 allowed him by order of the court, he agreed with the bank that he was to assume the $3,218.18 expenses of the litigation with reference to the Dolson con—

tract, and to refund to the bank $4,000, and that the balance, $11,781.-82, was to constitute his legal fees. The letters and his report, which are the only real evidence of the contract submitted to us, show otherwise.

. Petitioner was the largest "personal creditor" and a member of the depositors' committee, and by its action he became a receiver. After the allowances were made and the property returned to the bank, he made a report to his committee, giving an account of his stewardship, in which, among other things, he states that the fees awarded are excessive; that the maximum legal fees are $15,250.48; that he will not accept any fees not strictly within the limit allowed by law, even though the court should approve of them, and that he proposes to expose and condemn the acceptance of any immoderate or illegal fees by any party to the receivership; that he should return to the bank $4,000 and treat $15,000 as his legal fees. He explains the litigation on the Dolson contract, and that he was paid personally in expenses about $3,000 in that litigation, and says:

"I might, perhaps, have included that in my expenses as receiver and secured payment thereof from the funds of this trust; but I have believed that in proper justice they should be paid by the persons who improperly and illegally caused these expenses, and not from the funds of the depositors or the bank, which I protected by the defeat of this contract."

He then explains that he brought an action against his coreceiver to recover these expenses, and that, at the suggestion of the court, he had assigned the cause of action to the bank, but if the bank collected the amount he was to receive it. He says he had pledged himself to retain not one cent of the fees to himself, but that after paying his actual expenses he "would return the balance to the committee to be used in defraying its expenses and the fees of your counsel, etc. * * * I would not now for any consideration accept for myself one cent of any fees that might be legally or officially awarded to me in this receivership"; that from his legal fees he will retain $6,000 to cover his personal expenses, of which $3,000 are the expenses of the Dolson appeal, $2,000 paid for press expenses, and $1,000 for miscellaneous items; that he has paid to the depositors' committee $5,000; that the remaining $4,000 he will retain for a few months as a reserve fund, to be used in case of necessity for any expenses which he or the committee may have to meet; that if said reserve fund is not necessarily used he will return a part to the bank, the other part to be donated to some Brooklyn institution as a memento of the work, and that the bank has agreed to pay all the expenses of the committee not covered by the payments from his fees.

He gave himself credit for doing a great work, entirely without compensation, and of carrying on the Dolson litigation at his own cost, without any expense to the bank or the committee. He mailed to the bank a copy of this report, referring to its contents as showing that he is to accept no excessive fees, and is to dispose of his legal fees in the manner indicated in the report. He suggests that an action might be brought by the stockholders to recover the illegal fees paid to the receivers and counsel, and that there may be some possible liability

against himself and his coreceiver for signing checks for fees which may be held by a higher court to be illegal, and before turning over to the bank "the excessive or illegal part of my [his] fees" he asked it to relieve him by suitable agreement from such possible liability, and he reiterates the statement that he agrees out of his legal fees to pay all costs of the appeal in the Dolson matter, and closes:

"You will therefore note that by this disposition of the allowance made to me by the court that I practically turn over all of said allowance to the depositors and the bank, for the motives, purposes, and reasons sufficiently stated in my report and needing no repetition here."

The bank replied to this letter, thanking him for his services and the position he had taken, and then states that he had given the officers of the bank to understand that he would engage to pay the bank $3,000 from the $4,000 held as a reserve fund, the balance, less whatever incidental expenses he might be called upon to pay, to be applied to some charitable purpose in Brooklyn, and calls his attention to the fact that he failed to confirm that agreement in his letter.

This letter is attached to his petition. He does not deny that the bank was ultimately to receive $3,000 of the reserve fund. We should therefore treat it as a part of the understanding. It is not unreasonable that he offered to pay, and that the bank expected to receive it. Whatever he paid to the depositors' committee as a part of its expenses was virtually a payment for the benefit of the bank, which was to pay all of the committee's expenses not met by the receiver's fees. Any part of his fees which he agreed to pay to the depositors' committee was properly payable to the bank, after the bank had paid all the expenses of the committee. The committee's expenses were evidently $21,700, of which the bank paid $16,700, and the petitioner from his fees $5,000. These expenses were not legal charges against the trust or the bank, and the bank should not have paid them; but it was anxious to resume business. While the petitioner had agreed with the bank and the committee to retain none of the fees himself, except to reimburse him for the $6,000 expenses and the $1,000 for other expenses or a charity, the balance to be turned over to meet the expenses of the committee and to the bank, his services actually cost the bank $28,700, which it in fact paid in lieu of his legal fees of $12,000 allowed by the court. If he is permitted to retain the $3,000 in question, it will increase the expense to the bank on his account to $31,700, or $19,700 in excess of the fees of one receiver.

We determined in People v. Brooklyn Bank, 140 App. Div. 750, 126 N. Y. Supp. 155, that the consent of the bank to the allowances and terms of the order by which it resumed business was given under moral, if not legal duress. It is apparent that there was a verbal agreement covering all questions between the petitioner and the bank, which is evidenced, in part, at least, by the report and letters. Petitioner did not suggest that a release be given which would permit him to retain excessive fees; he only asked to be protected from payments made. It is evident that he and the bank understood that, he having returned the $4,000 to reduce his fees to "legal fees," as he said, it was proper that he should be released from liability on ac-

count of what he had paid to others. In fact, under the agreement the petitioner was not to retain any fees, legal or illegal. The fixing of his fees was merely nominal, as they, less the expenses mentioned and the·$1,000, were to be returned to the bank. Neither party, therefore, could have contemplated that this release related to money retained as fees, which both understood were legal and were designed ultimately for the bank, or to reduce its payments to the depositors' committee.

The release which the petitioner relies upon as a protection for retaining the excessive fees is not ambiguous. It recites the order of the court, and that whereas the receivers had made payments of the allowances, and whereas the order provided that on filing certain re- · ceipts and affidavits the petitioner should be forever discharged from any and all liability, and whereas and in the meantime, and until the filing of such receipts and affidavits and his discharge as such receiver thereupon, he desires to be released from any claim or action which the bank may have against him by reason of having made payments provided by said order to the receivers and their counsel and others. According to its terms the release was intended only to take the place of the order of the court before the receipts and affidavits were filed.

Some months after the execution of the release the petitioner for his own purposes took proceedings to review the allowances to his counsel, the coreceiver, and to himself, and succeeded in getting the order from which he now asks relief. He did not suggest to the court that he had made a private settlement with the bank as to his fees, and that · so far as he was asking to have his fees reviewed the proceeding was a farce. The court on his motion determined that he must return $3,000.

The bank took no part in obtaining the order in question. It evidently had had all the publicity it desired, and was only anxious to get out of court and to carry on its banking business, with the hope that the public would forget its failures and all the facts connected therewith. It stands here asking that the proceeding instituted by the petitioner be treated as taken in good faith and not for ulterior purposes. We must take the petitioner seriously, and not assume that in asking the judgment of the court whether the amount awarded him was excessive he was using the court for his own purposes without intending to be bound personally by its determination. He was the only party before the court questioning the fees of his coreceiver. If it had appeared that he had made a settlement for himself for $15,000, the court would have annulled the settlement, or have given his coreceiver the benefit of the same terms. This latter alternative would not have been agreeable to petitioner. There was no settlement or adjustment of fees between him and the bank. He stated what the legal fees were, and voluntarily accepted less, returning the balance. The bank accepted his statement and the money. There was no settlement of a disputed claim. After having procured an order that he is retaining illegal fees, he cannot now relieve himself by using a release which he concealed from his coreceiver and the court. It is against public policy to allow a receiver to bargain with a party interested in the trust for the payment of fees not permitted by law, and if the release were ca-

142 N.Y.S.—6

pable of the construction urged, it would be void as against public policy and without consideration. If a receiver has taken $7,000 more than his legal fees, he cannot voluntarily return $4,000 and thus relieve himself of the obligation to return the other $3,000.

Clearly the release was not executed for the purpose now claimed for it; it was executed solely to protect him from the payments which he had made to others. In contemplation of law, when he drew the funds from the bank, it was not a payment to himself. He is accountable for all the funds, and may account for a part of them by retaining his legal fees. The taking of money beyond his legal fees is not a payment which will be protected by the terms of the release. The bank took no proceedings to review the order; they were taken by him. He cannot obtain a modification of the order, bring an injury upon himself, and then ask to be relieved from that injury by a release which protects him from a proceeding taken by the bank. The bond does not purport to relieve him from the result of his own action.

It does not appear that he paid any expenses exceeding $1,000 which would properly be a charge upon the reserve fund. He could not, against the wishes of the bank, institute affirmative proceedings to review this order, which the bank had assented to, and charge the expense thereof upon the bank. His active duties were ended. All that remained for him to do was to file the release and affidavit. No other action was contemplated by the order of the court or the agreement with the bank. The bank had a fixed interest in the reserve fund, and may well insist that the part of it in which it is interested should be applied only after the $1,000 was expended in paying expenses incurred, but which had not been called to the attention of the receiver or the committee, or expenses coming upon them in "case of necessity," and the reasonable expenses in filing the receipts and the affidavit contemplated by the order. The bank and its stockholders were able to protect themselves, and the petitioner had no right to institute new proceedings at its expense. No case of necessity for other expenses is shown. There is, therefore, no reason or justice in the application.

The $3,000, upon any theory, is the property of the bank. If it represents excessive fees, the petitioner in law, and according to his contract and professions, cannot retain it. It cannot represent the expenses of the Dolson litigation, because the petitioner has already retained that sum as a part of the $6,000 for his personal expenses. If it represent either legal or excessive fees, then under the agreement between the parties it is a part of a fund which was primarily to be used to pay the committee's expenses; and, the bank having paid the committee, under the mutual understanding it belongs to the bank. The Dolson expenses were from the beginning treated by the petitioner as his personal matter. He agreed with the stockholders and the bank to pay them, and they are not properly chargeable against the trust; for under section 242 of the General Corporation Law (Consol. Laws 1909, c. 23) attorney's fees cannot be paid by a receiver until reported to and approved of by the Special Term. By not having

taken that course the petitioner makes it plain that they were not to be paid by the estate, but by himself. That has been his position from the beginning, and it is now too late to change it. If he pays the $3,-000, there is still in his hands the $1,000 to meet the other necessary expenses and for the Brooklyn charity.

The petition should be dismissed, with costs.